Good morning. We have five cases on our calendar this morning. Trade case from the Court of International Trade, two cases from the Court of Federal Claims, two patent cases from district courts. One of the claims cases is being submitted on the briefs and will therefore not be argued. The first case is Hartford Fire Insurance v. United States, 2013-15-85. Mr. Van Arnam. Good morning, Your Honor. Does it please the Court? CIT Rule 8 sets out the requirements for a pleading. It simply says that the pleading needs to have a short and plain statement of the claim, which shows that the pleader is entitled to a release. Mr. Van Arnam. Yes, Your Honor. Taking that rule into account, where in your second amended complaint are facts alleged that would allow this court to reasonably infer a connection between the world commerce entries and Sunline's default? Well, I think we've alleged several sets of facts that would allow that inference to be drawn. Pages 30-31 of the joint appendix would set these out. For starters, we allege facts that customs had received notice in the form of a letter as early as June of 2003 that there was criminal activity involved in the importation of the merchandise that Sunline was importing. We then also, at that same time, I believe it's paragraph 19-21 of the amended complaint, allege facts that there was an entry made by Sunline, the very importer that's involved in this case, that the customs service reviewed the entries of and rejected the entries because they determined that they were fraudulent. And so I believe the reasonable inference you could draw... My question was the connection between what Sunline was doing, which, by the way, as I recall, the first intimation that customs had was approximately two weeks prior to the bond. Is that right? Well, if we go to the letter, the letter was in June of 2003. June 17th, I believe, was the date of the letter, and the first of the Sunline entries was July 30th or July 27th of 2003. So there was more on the lines of several weeks' notice. But to answer your specific question, the nexus is you have the same importer importing the same product subject to the same anti-dumping duty order at the same time period. I don't think it's too far of a reach to assume that if this importer is engaging in fraudulent transactions in one set of entries at one port, it's likely that they could also be engaging in the same fraudulent activity at another port. This combined with the fact that the agency had already been alerted to the overriding problem involving importations of crawfish from China. So, Your Honor, I believe that would allow a reasonable inference to be drawn in plaintiff's favor that there was a connection between those transactions and the transactions at issue today. It seems to me that what you're arguing for is risk-free bonding. Your client sets their rates based on a possibility of a default of some sort. And they have to take into account the nature of the business and the nature of their clients. And you're attempting to put onto customs an investigatory obligation that I think probably lies with the insurance company. Well, Your Honor, you're correct in that Hartford does engage in underwriting to review potential to the potential entity that it's going to assure. But we have to look at the conduct of the government in this case because the government is a party to these bonds. They are the obligee. And they are the beneficiary of my client promising to stand good for the debt of the importer. So the situation here is... But the issuance of the bond wasn't their choice. Well, but Your Honor, if the government, as the obligee, has superior knowledge that the importer or that the principal obligor is involved in criminal activity and has reason to believe that the surety doesn't have access to that information, then in and of itself the bond can't be executed. It can't go into effect. So the abuse of discretion here is when the agency accepted these bonds. They knew this information. They knew Hartford didn't know this information. They knew that this information would go to the core of the promise that Hartford was making to stand good for the debt of the importer. And so that in and of itself is a conduct that needs to be looked at here. It's the conduct of the government. We're not asking the government to engage in underwriting on our behalf. We're asking the government, though, when they're participating in a contract to not take advantage of superior knowledge. Counsel, in your first complaint you alleged four causes of action. We did. Basically misrepresentation. And in your second complaint, following the trial judge's instruction, you alleged... How would you describe what you alleged? We alleged that the government acted arbitrarily, capriciously, and abused their discretion. Are you familiar with our cases that talk about a duty of good faith and fair dealing in contract relationships? I'm familiar with the concept. I'm not sure what case you're referring to. Well, we have a line of cases, the most recent one being Metcalf Construction, decided just this year, which impose on the government a duty of good faith and fair dealing. But I note that nothing in your complaint or your either first complaint or your amended complaint or in your brief raises that obligation that the government has. Did you consider it? No, we didn't, Your Honor. Have you decided it's not a good cause of action for you? Well, what we decided was in this situation, because the bond does not become an enforceable document until the customs service accepts it, that the fact that they actually accepted this bond, knowing what they knew was an abuse of discretion. My question is a simple one. Okay, well, we have not raised that argument, so we haven't put it before the court. You did not raise it. No, sir. It's not part of your case. It's not part of any of our briefings. It's best to let the judge finish his question and comment before you pounce on him. Thank you. So, as I read the record, in essence, what you're saying is that because the government began an investigation and yet had not reached any conclusion in that investigation, and even though the investigation is not only inherently confidential, that is, there's a law enforcement exception, but it is statutorily confidential, if it turns out that the investigation of someone goes nowhere, it would ill-behoove government and public policy to release that information. Despite that, you believe that the government should have told you there was something wrong. No, Your Honor. We understand that they couldn't have told us that before it prevents that. What we're saying is they could have exercised their discretion so they wouldn't have taken advantage of their superior knowledge. Again, they're a party to this bond. The superior knowledge is that they're looking. Exactly. That there was information provided to them that suggested that the bona fides of the Sunline Corporation were poor, and that that information is key to the promise that the surety makes to guarantee the debt of the importer. So, again, knowing that information, and also knowing that the FOIA prevented them from simply getting on the telephone and calling Harper and saying that, they had to take other steps within their discretion so as not to take advantage of that situation. But, of course, those are two entirely different producers of that product. Exporters. But the surety is not bonding the exporter, Your Honor. We're bonding the importer, and it was the same importer buying the same merchandise. And as for the exporter… From two different companies. Well, Your Honor, keep in mind that we… They're only investigating the one. No, they were… The imports from the one. Well, Your Honor, all due respect, we don't know what they were investigating because that information has been provided to us. We do know that eventually the outcome of whatever investigation they had resulted in the criminal conviction of two of the executives from Sunline. And we know, because we can look at those records, having made public, that there were specific entries involved that related to the criminal conviction. But we don't know what other entries were looked at. In fact, it's through these documents filed at the District Court in California that we have knowledge that Customs knew about the situation involving shipments of crawfish from China. That's where we got reference to the Shanghai Talon letter. That's where we got reference to the entries being rejected in the world commerce entries. So, again, we believe at this stage of the case, if we're going to read the facts in favor of the party opposing the motion and draw all inferences in our favor, the inference that we can draw here is that the government knew a set of facts. Those facts went directly to the heart of the surety's promise. The surety didn't know those facts. And the government, knowing the surety didn't know those facts, took the affirmative step to accept the bonds when, in fact, they could have rejected the bonds. They could have rejected the entire Customs entry. They have the discretion to do that. Do you think that if you got a trial before the judge, you would be able to bring in sufficient evidence to prove what? I believe we would be able to engage in some form of discovery to learn what the government knew and when they knew it and how they acted on it. And if, in fact, what they knew shows that they had knowledge that there was an ongoing criminal investigation involving Sunline, I believe that we can make out a claim that they abused their discretion when they accepted these bonds and, in effect, created the surety obligation that they're now looking to Hartford to pay. Your Honors, I'm into my rebuttal. If there are no questions, I'll reserve the rest of my time. We will save it for you, Mr. Van Arnam. Thank you. Mr. Tenor. Nice to see you again, Mr. Van Arnam. Nice to see you. And you too, Mr. Tenor. Good morning. May it please the Court. This Court should sustain the trial court's decision to properly dismiss Hartford's second amended complaint for failure to stay the claim. Hartford's second amended complaint makes out a cause of action for an abuse of discretion vis-à-vis customs actions with respect to the HUBI entries and the Hartford bond securing those entries. There is no facts in the second amended complaint establishing any link between the investigation, the HUBI entries or the bonds, or the World Commerce entries and any issues with respect to those and the HUBI entries and the bonds. Now, Hartford points to four government actions or inactions that it believes are an abuse of discretion. First, it alleges we abuse our discretion by allowing Sunline to post bonds in lieu of cash deposits. As the trial court properly found at the time these entries were coming in, 1675, put the option of a bond or cash deposit in the option of the importer. That doesn't relieve the government of its duty to pay attention to what's going on, does it? Certainly, but there's no facts in the second amended complaint to suggest that there was any issues with respect to these entries, these bonds, or there was any reason to believe these bonds didn't fully secure these entries. Hartford keeps pointing to the government's discretion to protect the revenue of the United States and it alleges that we abuse our discretion and that we could have secured these transactions in a better manner. However, that's an obligation owed to the United States of America, not to Hartford, nor is there any suggestion or any facts to suggest that customs had done anything other than fully secure these transactions. Put aside the timing of this problem for the moment. Let's assume that six months before these entries were involved, Sunline's entries, and the surety contract was entered into, let's assume six months before that, the government prosecutes or is investigating or has good evidence that Sunline is engaged in fraudulent activity, including fraudulent entries. Would that be relevant? If they'd been prosecuted for improper entries, they would no longer be allowed to enter merchandise into this country. Well, they're under investigation and the evidence is pretty clearly going to lead in that direction, but no decision has yet been made because the government doesn't make quick decisions. So let's assume all that's known six months before these entries. I do not believe that would make out a cause. The cause of action that Hartford has set forth, that we've abused our discretion, there would be no link to entry paperwork in the eventual default on entries not at issue or not alleged to be part of that investigation. There's a dichotomy between what they're pointing to, the investigation into improper paperwork, and the World Commerce entry, but there's no bridge between them. There's no allegations that there was any reason to reject the Dubai entries, require further security, or do any of the actions Hartford alleges. You make that argument and it appears in your brief too. Let me give you a hypothetical case. Mr. Kenner goes to the Ford dealer and says to the Ford dealer, I'd like to buy a Ford and I'd like you to finance it for me as you have advertised. The Ford dealer has never dealt with you before and you've never dealt with the Ford dealer before, but it is true that you had previously gone to the Chevrolet dealer, made the same proposition the Chevrolet dealer had bought into it and you never paid for the Chevrolet which they had to then recover and lost money on. The Ford dealer happens to know of your history because Ford dealers and Chevrolet dealers talk to each other and the Ford dealer says to himself, this guy, Kenner, he's a loser. I'm not going to lend him money. Could you sue the Ford dealer for using his knowledge about the Chevrolet dealer in making his decision? I would presume not. I would presume not too. Why is this case any different? It is true that the particular entries involved in this particular crawfish collection were not the subject of an investigation, but it was the same importer who was the subject of an investigation and if the information about that investigation was in the government's hands before the suretyship contract, wouldn't the government have to say something or be aware? Well, several things, Your Honor. There was already a decision... While you're answering, answer this too. Does the fact that an importer violates its obligations on a particular entry mean that its other entries are necessarily improper? No, Your Honor, and the investigation here was with respect to entry paperwork, not with respect to failure to pay.  That may be more relevant to whether I'm going to pay for the Ford car. Here, there was no investigation with respect to Sunline or no allegations that there was any issue with respect to Sunline's payment of duties when they became oweable. Although there was an allegation that there was an issue with respect to their paperwork. There's no bridge between paperwork and the failure to pay and to buy entries. What was the paperwork related to? It was related to entries and putting down improper manufacturers to get around anti-dumping duties. These entries were anti-dumping entries. They were entered as anti-dumping entries. So there's no real link between looking at other paperwork for skirting anti-dumping and these entries which were entered as anti-dumping and their eventual default. Isn't there a finding below? There's nothing in the pleadings to plausibly suggest that Customs' investigation had proceeded to the stage where Customs had reason to believe that the entries were problematical or that new shipper bonds would be insufficient security. Yes, the court did make that finding. And the court correctly made that finding. There's no link between the investigation, the World Commerce entries, and the HUBI default. And there's nothing to suggest that Customs abused discretion in accepting the Hartford bonds to secure these transactions or not requiring any further security. No further questions? I believe that's all I have to say. Fine. Thank you, Mr. Kenner. Mr. Van Arnam has a little more than four minutes to rebut. Your Honor, I'd like to address a point that Mr. Kenner just made. He kept talking about the investigation and how there's no connection between the investigation, the World Commerce entries, and the entries before the court right now. And, Mr. Torrey, you referenced the Court of International Trade's reference to this decision hadn't gotten far enough where there'd be a conclusion that there'd been a violation. First of all, neither Mr. Kenner nor the court below has seen the investigation. We don't know the scope of the investigation. We have no idea if that June 7, 17, 2003 letter identified the exact transactions and the exact importer. We don't know any of that. That's why this case needs to go forward so we can learn facts to determine whether or not we have a claim. Now, the second thing we also keep in mind is the standard here is, did the government, as the obligee on these bonds, have material facts that went to the core of the decision of my client to promise to guarantee the obligations of the importer? So I believe we have a question of fact as to whether or not a letter would constitute enough of a material fact. Or do you need to have a formal conclusion of an investigation where there's a final decision that there's been bad doing, if that's what rises to the level of material fact? What was the misrepresentation that the government made in the course of the surety ship contract between Sunline, your company, and the government? What was the exact misrepresentation that you're alleging? The government, as the obligee on the bond, cannot accept my client's promise to sustain goods for the debt of the importer when the obligee knows, or has reason to know, that it knows material facts that go to the heart or to the core of my client's promise. But that's a negative proposition. Is there some affirmative misrepresentation that they made? Your Honor, for purposes of making out a common law claim for material misrepresentation, it doesn't have to be an active statement. It can be exactly what happened here. It's a relying on information that it knew that the surety didn't know, and that was key to the underlying decision that the surety made to assume that risk. Okay. So, Your Honor, so I've finished my presentation. Unless there are additional questions from the bench? Thank you.  Thank you, Your Honor. Thank you.